United States & Foreign Securities Corporation v. Commissioner.
United States v. Commissioner
Docket No. 106648.
United States Tax Court
1943 Tax Ct. Memo LEXIS 181; 2 T.C.M. (CCH) 525; T.C.M. (RIA) 43358; July 27, 1943
*181 Charles C. Parlin, Esq., 63 Wall St., New York City, and Samuel A. McCain, Esq., 63 Wall St., New York City, for the petitioner. Dean P. Kimball, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: This proceeding is for a redetermination of income tax deficiencies and penalties in the following amounts: Year
Deficiency
Penalty
1935
$11,333.59
$ 566.68
1936
80,472.22
4,023.61
1937
17,251.18
862.56
The parties have now stipulated that there are no penalties due. The sole issue is what bases certain securities had in the hands of the petitioner for gain or loss. The answer depends upon whether the syndicate from which petitioner received the securities in 1931 and 1935 was an association taxable as a corporation. From the stipulation and the evidence, we find the following facts. Findings of Fact The petitioner is a Maryland corporation with its principal office at 921 Bergen Avenue, Jersey City, New Jersey. It filed its returns for the taxable years with the collector of internal revenue at Newark, New Jersey. Seaboard Air Line Railway Company, sometimes referred to as Seaboard, stocks and securities were selling below par due *182 to falling earnings. The petitioner and other participants in a syndicate believed that by simplifying the capital structure of Seaboard and improving its position through a reduction of the funded debt and interest charges by getting additional capital from the sale of common stock and also by the injection of new management blood, there would be an appreciation in the value of Seaboard securities. Prior to the organization of the syndicate the participants never expected to deal in any other stock but expected to make a profit by the rise in the value of Seaboard securities. The syndicate agreement was entered into on November 30, 1928 and contains inter alia: SYNDICATE AGREEMENT New York, N. Y.
November 30, 1938. 1. The undersigned (hereinafter called Participants) hereby form a Syndicate to buy, sell, trade and deal in securities. The term "securities" as used herein shall mean and include shares of common stock, preferred stock, bonds, notes and other obligations or securities, including equipment obligations, of Seaboard Air Line Railway Company and/or of any other corporation or association. * * * 2. The Syndicate shall have maximum aggregate participation of $7,500,000, *183 but shall become operative when the Managers have received and confirmed participations totaling $4,500,000. Each Participant shall be liable for the amount of his participation set opposite his name at the foot hereof and no more, except as provided in paragraph 6 hereof. 3. Participants shall be respectively obligated to make payments on their participations to Dillon, Read & Co. in New York Funds, at the New York office of Dillon, Read & Co., from time to time upon call of the Managers and each Participant shall meet his other Syndicate obligations (including the payment of his pro rata share of the cash requirements of the Syndicate), if any, upon call by the Managers. Calls shall be made pro rata upon the Participants. Call will presently be made upon Participants for payment of 40% of the participation of each Participant. 4. The Syndicate Managers * * * shall have the sole management and entire conduct of the business and affairs of the Syndicate, with all usual powers and all powers which they may deem expedient for carrying out or accomplishing the purposes for which the Syndicate is formed, including the selection of additional securities to be purchased by the Syndicate; *184 the determination of the price and of the terms of purchase of such securities; the determination as to what Syndicate assets shall be sold and the time and terms of any such sales; the determination as to any merger or conselidation of any two or more companies, the stock of which or a part of which may be held by the Syndicate; the determination as to all loans to, and as to any distributions by, or issues of securities by any company controlled by the Syndicate, as to the time and terms of the issue of such securities and all other matters, including the voting of any and all stock held by the Syndicate, the formation of any voting trust in respect of any stock held and the selection of voting trustees therefor, the selection of directors of any company, the stock of which may be owned by the Syndicate or of any corporation that may be formed for the purposes of the Syndicate. 5. The Managers may form or cause to be formed one or more corporations, vest the ownership of any and all securities held by the Syndicate or any part thereof in such corporation or corporation * * * and may select the officers and directors of any such corporation and generally determine all questions *185 whether of substance or form arising in connection with the organization or financing thereof. 6. The Managers shall have the right to borrow money for account of the Syndicate, to pledge the securities owned by the Syndicate as security for any such loan or loans, and to pledge the obligations of Participants in the Syndicate hereunder, but no such loan or pledge shall bind any Participant to an aggregate amount exceeding the unpaid portion of his participation. The Managers may, for account of the Syndicate, incur any expenses deemed by them appropriate, pay all commissions and/or other expenses of every nature and purchase, sell, sell short, repurchase, resell, and/or hold securities to such amounts, at such prices, and in such manner, as the Managers may deem advisable, and generally may act in all respects as in their opinion may be to the best interests of the Syndicate, provided only, that the Syndicate shall never at any time be committed for a net long position in excess of the total participations in the Syndicate and/or be chargeable for a net short position in excess of 25% of the total participations in the Syndicate. * * * * *
8. The Managers shall receive no compensation *186 for their services as Managers but any Manager may participate in the Syndicate in the same manner and to the same extent as if he were not a Manager and shall not be under any accountability therefor, except as a Participant. * * * 9. It is recognized that some of the Managers or some of the Participants, or business with which they are connected, may, to the exclusion of other Managers or Participants, become interested in action taken or proposed to be taken by the Managers. Accordingly, it is agreed that anything herein to the contrary notwithstanding, the Managers may submit to the Participants any action taken or proposed to be taken by them and if such action is ratified or approved by Participants who own a majority interest in the Syndicate, without regard to the interest of such approving Participants in such action, then the Managers shall be deemed authorized to take such action. * * * 10. The Managers shall not be liable under any of the provisions hereof or for any matter connected herewith, except for want of good faith, and no obligation not expressly assumed herein shall be implied herefrom. * * * Each participant shall be responsible for his own individual participation *187 and nothing herein contained shall constitute Participants partners with the Managers or with one another or render the Managers liable in any way for the obligations of the Participants. 11. Dillon, Read & Co., together with any two of the other Managers, may act for the Managers. The Managers may act either at a meeting or in writing or by telephone, telegraph or wireless without a meeting. Any Manager may vote or act by proxy (who may, but need not be, another Manager), and the vote or act of such proxy shall be as effective as the vote or act of the Manager appointing such proxy. 12. The Syndicate shall continue until May 30, 1929 and may be extended for one or more successive periods of six months each by notice from the Managers to the Participants; provided, that the Syndicate may be terminated by the Managers at any time in their discretion whether or not extended. 13. Participants will share in Syndicate profits, losses, distributions and expenses pro rata; that is to say, in the proportions that the respective amounts of their participations shall bear to the total amount of all participations in the Syndicate. Distribution of profits may be made by the Managers in their *188 discretion and may be made in cash and/or in securities or other property. Apportionment and distribution by the Managers of profits, losses, distributions and expenses shall be conclusive upon the Syndicate and the Participants, as shall be the written statement by the Managers of the results of the Syndicate. 14. The Managers may in their sole discretion release any Participant for any cause and substitute another Participant satisfactory to them as Managers, provided such substituted Participant shall assume the obligations of such released Participant. In case of any default on the part of any Participant, his interest in the Syndicate and/or any securities held by the Syndicate may be sold at public or private sale with or without notice and any Participant or Participants or the Managers may be the purchaser or purchasers thereof, but every defaulting Participant shall nevertheless be responsible to the extent of his full liability hereunder. The Managers, however, may in their discretion make any adjustment with any Participant which they as Managers shall deem proper. The death, release or default of any Participant or the dissolution of any corporate or partnership Participant *189 shall in no way release any other Participant from his full obligations hereunder. 15. If any securities remain unsold at the expiration of the Syndicate, the Managers may sell such securities * * * or the Managers may in their discretion distribute all or any part of such securities to Participants in proportion to their respective participations. * * * * *
In only three cases were there substitutions of participants and in each case the bank from which the syndicate had obtained money approved the substitution and released the assignor, (one of the released participants was a manager). The only amendment made was an increase in the size of the syndicate and it was made upon the written consent of every party to the agreement. As first set up the syndicate did not call for the total amount of participations but later in 1930 and 1931 the remaining portions were called. The method of making bank loans is shown by the procedure followed in making a loan from the Equitable Trust Company. In view of the fact that there might be some doubt as to the law on the subject the bank did not want to take any risk and so required the signature of all participants as as well as the managers *190 when the unpaid participations were pledged as collateral. Payments were made to the bank by the individual checks of the participants. When the loan was satisfied the unpaid participations were reassigned to the managers. Although the agreement called for only a period of life of six months, it was extended four successive times, the last extension being to May 30, 1931. At the time the agreement was entered into the participants knew that it would take considerable time to get the needed approval of the Interstate Commerce Commission for the proposed plan of recapitalization of Seaboard. Distributions were made to the participants principally on March 17, 1931 and July 2, 1935. The fair market value of the securities on those dates was considerably below the average cost to the syndicate. The following facts concerning the syndicate are of interest: (a) the syndicate itself never had any employees but the work was done on its behalf on the premises of and by the employees of Dillon, Read & Co., one of the syndicate managers; (b) the syndicate was never listed in any telephone book or directory and all correspondence was addressed to Dillon, Read & Co., or to the managers at the *191 address of Dillon, Read & Co.; (c) the syndicate never had a seal; (d) the syndicate never had anything resembling by-laws; (e) the syndicate never had a deed of trust or articles of incorporation or association executed, filed or agreed to unless the agreement is such. The syndicate's managers would meet from time to time to decide matters entrusted to their decision under the terms of the agreement but there were never any meetings called or held by all the parties to the agreement. (f) The syndicate never had any seat on the stock exchange nor did it have a license as a dealer in securities. It had no customers as would a brokerage or securities house. (g) No certificate of participation or any document having the character of security or other evidence of beneficial interest in the agreement or in the assets was ever issued. (h) All securities held by the managers were registered in street names or held in bearer form. (i) No proxies in respect of the stocks held were ever signed either in the name of the managers or in the name of the syndicate although proxies to vote such stocks were delivered and used by the managers pursuant to the agreement. (j) No change was ever made in *192 managers (the release of one as a participant is not explained) nor was any contemplated except in the case of one who at the time of the original agreement was not certain he could serve. (k) The only financial information furnished to the parties was statements of the debits and credits appearing in the syndicate's account on the books of Dillon, Read & Co. (1) The syndicate had an account with Dillon, Read & Co. covering the cash paid in and otherwise received under the agreement. It had, however, no account with any commercial bank. In 1935, 1936 and 1937, petitioner sold the securities received in the 1931 and 1935 distributions from the syndicate. The syndicate was not an association taxable as a corporation. Petitioner made a payment on account of the disputed deficiencies after the filing of the petition herein and claims an overpayment of income tax. All facts stipulated but not expressly found herein are incorporated by reference. Opinion The question for determination is what bases certain securities had for gain or loss in the hands of petitioner. The securities in question were received by petitioner in 1931 and 1935 as distributions in kind in the liquidation of *193 a syndicate in which it was a participant. The securities were sold by petitioner in the taxable years here involved. The answer to the above question depends upon whether the syndicate was an association taxable as a corporation. If it was an association then the bases are the fair market values of the securities when distributed. If it was not an association the bases of the securities for gain or loss are determinable in accordance with the provisions of section 113 (a) (13) of the Revenue Acts of 1934 and 1936. [1]
*194 Petitioner contends that the syndicate was not an association within the meaning of the statute. Section 501 (a)(2) of the Revenue Act of 1935; section 1001 (a) (2), Revenue Act of 1936. The principal contention is that the syndicate was merely a principal-agent relationship. Chief reliance is placed by petitioner upon Tennessee, Alabama & Georgia Railway Company, et al., v. Hoey, Fed. Supp. (D.C.S.D. N. Y.). Petitioner contends that there was no association taxable as a corporation and, hence, there was no closed transaction when the securities were distributed to petitioner. Respondent contends that the syndicate was taxable as a corporation and that there fore the basis is the fair market value at the time of the distribution. He also makes an alternate contention in regard to the 1931 distribution which will not be here discussed. He makes no effort to distinguish the Tennessee, Alabama & Georgia Railway Company case but states that the case was decided erroneously. This problem is essentially a fact problem and each case is to be decided upon its own peculiar facts. ; ; *195 ; . The instant proceeding is not distinguishable on the facts from the Tennessee, Alabama & Georgia Railway Company case in which the syndicate there involved was held not an association taxable as a corporation. The terms of the syndicate contract here are identical in all essential particulars with the terms of the syndicate contract in that case and all other essential facts in the instant proceeding are closely parallelled by facts in that proceeding. It is obvious that if such conclusion is correct, a similar disposition should be made of the instant case. We agree with the conclusion there reached. Accordingly, we hold that the syndicate here involved was not an association taxable as a corporation. It follows that the bases for gain or loss of the securities here in question are determinable in accordance with the provisions of section 113 (a) (13) above cited. Decision will be entered under Rule 50. Footnotes
1. SEC. 113. ADJUSTED BASIS FOR DETERMINING GAIN OR LOSS. (a) Basis (Unadjusted) of Property. - The basis of property shall be the cost of such property; except that - * * * * *
(13) Partnerships. - If the property was acquired, after February 28, 1913, by a partnership and the basis is not otherwise determined under any of the paragraphs (1) to (12), inclusive, of this subsection, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made. If the property was distributed in kind by a partnership to any partner, the basis of such property in the hands of the partner shall be such part of the basis in his hands of his partnership interest as is properly allocable to such property.↩